## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**TIMOTHY K. POYNTER**                                                      **PLAINTIFF**

**V.**                              **CASE NO. 4:13CV00079-JTR**

**CAROLYN W. COLVIN, Acting Commissioner,**
**Social Security Administration**                               **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

Plaintiff Timothy K. Poynter appeals the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claims for Disability Insurance benefits ("DIB") under Title II of the Social Security Act ("the Act") and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act.  For reasons set out below, the decision of the Commissioner is AFFIRMED.

## I.    Background

Mr. Poynter protectively filed for DIB and SSI benefits due to lupus anticoagulant with an onset date of November 1, 2008.  (SSA Record at 75, 79, 87, 89, 133-35, 138-41) Mr. Poynter's claims were denied initially and upon reconsideration.  (*Id*. at 75-81, 87-91) At Mr. Poynter's request, an Administrative Law Judge ("ALJ") held a hearing on October 6, 2011, at which Mr. Poynter appeared with his lawyer.  (*Id*. at pp. 24-70)  At the hearing, the ALJ heard testimony from Mr. Poynter and a vocational expert ("VE"). (*Id*.)  The ALJ issued a decision on March 30, 2012, finding that Mr. Poynter was not disabled under the Act.  (*Id*. at 8-19)

Mr. Poynter filed a request for review with the Appeals Council which was denied, making the ALJ's decision the Commissioner's final decision.  (*Id*. at 1-3)

Mr. Poynter, who was 30 years old at the time of the hearing, had a high school equivalence certificate and past relevant work experience as a cashier, pizza cook, dishwasher, hand packager, forklift driver, shipping and receiving clerk, and yard truck operator.  (*Id*. at 17, 30-39)

## II.   <u>Decision of the Administrative Law Judge</u>[1]

The ALJ found that Mr. Poynter had not engaged in substantial gainful activity since November 1, 2008, and that he had the following severe impairments:  lupus anticoagulant, recurrent deep vein thrombosis, history of right femur fracture status post open reduction and internal fixation, major depressive disorder, and generalized anxiety disorder.  (*Id*. at 10-11)  The ALJ found, however, that Mr. Poynter did not have an impairment or combination of impairments meeting or equaling an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.[2]  (*Id*. at 11-13)

---

[1] The ALJ followed the required sequential analysis to determine: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; and (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(a)-(g) 416.920(a)-(g) (2005).

[2] 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926.

According to the ALJ, Mr. Poynter had the residual functional capacity ("RFC") to perform sedentary work, but could not climb, kneel, crouch, or crawl and could only occasionally balance and stoop.  Additionally, the ALJ found that Mr. Poynter should be limited to work where interpersonal contact is incidental to the work performed and where the complexity of tasks is learned and performed by rote, with few variables and little judgment required, and supervision required is simple, direct, and concrete.  (*Id*. at 13)  The VE testified that an individual with those limitations could perform the job of patcher.  (*Id*. at 18)

After considering all of the evidence in the record, including the VE's testimony and other evidence, the ALJ determined that Mr. Poynter could perform a significant number of other jobs existing in the national economy and found, therefore, that Mr. Poynter was not disabled.  (*Id*. at 13-18)

## III.   **Analysis**

### A.    **Standard of Review**

In reviewing the Commissioner's decision, this Court must determine whether there is substantial evidence in the record as a whole to support the decision.  *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); 42 U.S.C. § 405(g).  Substantial evidence is "less than a preponderance, but sufficient for reasonable minds to find it adequate to support the decision."  *Id*. (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)).

3

When looking at the record as a whole, the Court must consider both evidence that detracts from the Commissioner's decision and evidence that supports the decision; but, the decision cannot be reversed, "simply because some evidence may support the opposite conclusion." *Id*. (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).

**B.    Step 3**

Mr. Poynter complains that the ALJ erred by failing to discuss his Global Assessment of Functioning ("GAF") scores of 40[3] and 50[4] when performing the Special Technique to determine whether he met the requirements of listing 12.04 and 12.06. Mr. Poynter argues the GAF scores undermine the ALJ's finding that he did not meet a listing. This argument lacks merit for several reasons.

First, the ALJ's failure to discuss the scores when making his finding that Mr. Poynter did not meet a listing is not reversible error because GAF scores are not dispositive for determining whether he had the limitations set forth in the "B" and "C" criteria of Listings 12.04 and 12.06. As the Eighth Circuit has recognized, a claimant's

---

[3]*The Diagnostic and Statistical Manual of Mental Disorders* (4th ed.) (DSM–IV), published by the American Psychiatric Association, states that a GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. (DSM–IV 32).

[4] DSM–IV, published by the American Psychiatric Association, states that a GAF score of 41 to 50 generally indicates serious impairment in social, occupational, or school functioning. (DSM–IV 32)

GAF score may have little or no bearing on the claimant's social and occupational functioning. *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010).

Moreover, mental health professionals no longer use GAF scores. The GAF was dropped from the *Diagnostic and Statistical Manual of Mental Disorders* due to the GAF's "conceptual lack of clarity (*i.e.* including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *Diagnostic and Statistical Manual of Mental Disorders*, 16 (5th ed.) Am. Psychiatric Ass'n 2013.

Second, here, the ALJ carefully considered the "entire record" when considering whether Mr. Poynter's mental impairments met listings 12.04 and 12.06. (SSA record at 11-13) There is no evidence that Mr. Poynter sought treatment for depression between November 2008, his alleged onset date, and September, 2011, a month before the administrative hearing or that he sought further treatment after December, 2011. Notably, the record contains only three GAF scores that were assessed on two separate dates during the four-month span when Mr. Poynter sought treatment for his depression. (*Id*. at 326, 340, 348) Accordingly, this case does not present a long history of GAF scores that would support reliance on the scores over the rest of the records.

Third, the ALJ specifically referred to the records from Mr. Poynter's meeting with counselor Ashley Donaldson, as well as the treatment notes of Jeremy Thompson, M.D., which included the GAF scores, when discussing whether Mr. Poynter met the criterial of listings 12.04 and 12.06. (*Id*. at 11) Additionally, the ALJ referenced the

consulting report of Nancy Toombs, Ph.D.  (*Id*. at 11-12)  The opinions of Dr. Toombs and Dr. Thompson support the ALJ's determination that Mr. Poynter did not have an impairment that met a listing.  (*Id*. at 339-41, 343-44, 346-47)  The ALJ may afford greater weight to medical evidence and testimony rather than to GAF scores.  See *Jones v. Astrue*, 619 F.3d 963, 974 (8th Cir. 2010).

Finally, Mr. Poynter has not shown that, given all of the evidence in the record, the ALJ would have come to a different conclusion about his meeting the criteria of paragraphs "B" and "C" of the Listings if the ALJ had specifically discussed the GAF scores.  The ALJ's failure to discuss the scores was not reversible error.  See *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012)

## C.    Residual Functional Capacity

Mr. Poynter complains that the ALJ's mental RFC assessment is not supported by the medical opinion evidence, but rather, is based on his rejection of the medical evidence in the record.  (#10 at p. 9)  Mr. Poynter, again, relies heavily on the two GAF scores of 40 and 50 to argue that he was more limited than the ALJ found in his RFC assessment. (#10 at p. 11)  As explained, however, the GAF scores are not determinative.

Here, there is substantial evidence to support the ALJ's mental RFC assessment. Dr. Thompson, the treating psychiatrist, assessed Mr. Poynter twice in a three-month

span.[5]  On examination on September 16, 2011, Ashley Donaldson, LAC, noted that Mr. Poynter was oriented to person, place, situation and time; his recent memory was intact; his intelligence was average; and he was not at risk for harming himself or others.  (*Id.* at 330, 352)[6]  Although he claimed to push people away, he had been married for four or five years and had two children that he helped care for.  (*Id*. 331-32, 334, 354, 355-56)  He was diagnosed with major depressive disorder, assigned a GAF score of 40 and was prescribed individual therapy and medication.  (*Id*. at 334-35, 356-57)  On September 21, 2011, Dr. Thompson signed off on Mr. Poynter's treatment plan.  (*Id*. at 326-28)[7]

When Mr. Poynter was evaluated by Dr. Thompson in October, 2011, he was noted to be depressed, anxious, and irritable, but his thought process was judged to be intact; his social skills were adequate; he was cooperative; his sleep was normal; he had no hallucinations; and he was motivated for treatment.  (*Id*. at 347)  He was again

---

[5]It is unclear from the records whether Dr. Thompson actually examined Mr. Poynter in September, 2011, or merely signed off on the master treatment plan after Mr. Poynter met with counselor Ashley Donaldson.  (SSA record at 326-28, 349-51)

[6]Ms. Donaldson's notes from her meeting with Mr. Poynter on September 16, 2011, appear in the record twice.  These records first appear with the heading Day Spring Behavioral Health Services at record pages 329-335, and then appear again with the heading Alternative Opportunities, Inc. at record pages 352-57.

[7]Mr. Poynter's treatment plan also appears in the record twice.  The plan first appears with the heading Day Spring Behavioral Health Services at record pages 326-28, and then appears again with the heading Alternative Opportunities, Inc. at record pages 349-51.

diagnosed with major depressive disorder and was assessed with a GAF score of 50.  (*Id.* at 347-48)

The ALJ arranged for Mr. Poynter to have a consultative psychological examination.  After examining Mr. Poynter, consulting examiner, Nancy Toombs, Ph.D., opined that Mr. Poynter had mild limitation in his ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions; and moderate limitation in his ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to changes in a routine work setting.  (*Id.* at 343)  Dr. Toombs's opinion supports the ALJ's finding that Mr. Poynter is capable of unskilled work.

### D.     Credibility

Finally, Mr. Pointer claims that the ALJ improperly relied on lack of compliance with treatment to impugn credibility.  More specifically, Mr. Poynter claims that his noncompliance with medication should be excused because he was unable to afford his prescribed medication.  This argument lacks merit.

Mr. Poynter's treating physician, A. Dale Barton, M.D., repeatedly noted that Mr. Poynter was non-compliant with taking his medications (*id.* at 250, 252, 266, 271, 272, 273), and none of the treatment records indicate that Mr. Poynter complained to Dr. Barton about an inability to pay (*id.* at 272-73, 252, 271, 266).  During a visit to St.

Mary's Regional Medical Center in September, 2010, Mr. Poynter stated that he took his medication, Coumadin, "whenever I feel like I should take them." (*Id*. at 306) Similarly, in October, 2010, Mr. Poynter stated to consulting examiner John C. Dobbs, M.D., that he took his Coumadin as he "sees fit." (*Id*. at 285)

Mr. Poynter's assertion that he could not afford to take his medications is also called into question by his admission that could afford to smoke a pack of cigarettes per day. (*Id*. 252, 256, 275, 306, 310, 338) Further, Mr. Poynter's free treatment at River Valley Christian Clinic in 2011 indicates, that had he sought treatment and medication from a low cost or free medical clinic sooner, it would have been available. (*Id*. at 314-20)

Additionally, consulting physical examiner Dr. Dobbs noted that Mr. Poynter was "uncooperative" during his exam. (*Id*. at 285-290) And results of the Computerized Assessment of Response Bias test administered by Dr. Toombs indicated conscious or unconscious exaggeration that called into question the results of Dr. Toombs's examination of Mr. Poynter. The ALJ did not err in finding Mr. Poynter's credibility lacking. See *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005)(failure to follow a recommended course of treatment weighs against a claimant's credibility).

### E.    Step 5

At the hearing, the VE testified that a person with Mr. Poynter's level of physical and mental impairment  could perform the job of patcher, and, although a sit/stand option

or a need to elevate his feet above waist-level would reduce the number of jobs available, he could still perform the job. (*Id*. at 64-63)   The VE testified his testimony was consistent with the *Dictionary of Occupational Titles* ("DOT").

Mr. Poynter argues that the job of patcher requires reasoning skills that exceed his assessed RFC. (#10 at p. 13)  Unskilled work, however, corresponds to an SVP level of 1–2, and the DOT listing for the job of patcher indicates the SVP level for the job is 2. *Dictionary of Occupational Titles,* 723.687-010, 1991 WL 679524; SSR 00–4p, 2000 WL 1898704, *3 (Dec. 4, 2000)("DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings"); *Moore v. Astrue*, 623 F.3d 599, 604–05 (8th Cir. 2010)("there is no direct conflict between 'carrying out simple job instructions' for 'simple, routine and repetitive work activity,' as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate" ).

Mr. Poynter also argues that the ALJ should have included a need to elevate his leg to his chest as a limitation to his RFC; however, Dale Barton, M.D., stated that Mr. Poynter could perform any job except ones that required prolonged standing and bending. *(Id*. at 266)  His assessment supports the ALJ's hypothetical and his conclusion at step 5. The ALJ did not err in relying on the VE's testimony.

**IV.**     **Conclusion**

The Court has reviewed the entire record, including the briefs, the ALJ's decision, the transcript of the hearing, and the medical and other evidence.  There is ample evidence on the record as a whole that "a reasonable mind might accept as adequate to support [the] conclusion" of the ALJ in this case.  *Richardson v. Perales*, 402 U.S. at 401. The Commissioner's decision is not based on legal error.

Accordingly, Mr. Poynter's appeal is DENIED, and the Clerk of Court is directed to close the case.

IT IS SO ORDERED, this 2nd day of June, 2014.

_____
UNITED STATES MAGISTRATE JUDGE